J-A04045-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| Ra.J. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| Re.J. | : | |
| | : | |
| Appellant | : | No. 2423 EDA 2019 |

Appeal from the Order Entered August 28, 2019
In the Court of Common Pleas of Bucks County Civil Division at No(s):
No. 2009-61801

BEFORE:   PANELLA, P.J., STRASSBURGER, J.[*], and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED MARCH 27, 2020**

Appellant, Re.J. ("Mother"), *pro se*, appeals from the order entered from the bench on July 1, 2019, and in writing on August 28, 2019, denying her motion to modify an existing custody order from 2013 for her biological child, K.J. ("Child"), born 2005.  In addition, Mother has filed an application for post-submission communication; in response, Appellee, Ra.J. ("Father"), submitted a motion to strike Mother's application.  After careful review, we affirm the trial court order, grant Mother's application for post-submission communication, and deny Father's motion to strike.

In its opinion, the trial court fully and correctly set forth the relevant facts and procedural history of this case.  **See** Trial Court Opinion ("TCO"),

_____

[*] Retired Senior Judge assigned to the Superior Court.

dated September 27, 2019, at 1-34. Therefore, we have no reason to restate them at length here.

For the convenience of the reader, we briefly note that three separate custody evaluations have been conducted in the current action: the first was performed by Dr. Anthony Pisa, whose report is dated November 9, 2010 ("2010 Evaluation"); the second was performed by Dr. Margaret Cooke, whose report is dated March 29, 2013 ("2013 Evaluation"); and the third was performed by Dr. Gerald Cooke, whose report was dated September 28, 2018 ("2018 Evaluation"). Father, an anesthesiologist, had requested the 2018 Evaluation; "[s]ince the parties could not agree on who would conduct the evaluation, th[e trial c]ourt appointed Dr. Gerald Cooke." *Id.* at 2, 36. The 2018 Evaluation recommended that Mother should have primary physical custody of Child. *Id.* Father also engaged Dr. Steven Cohen to critique the 2018 Evaluation. *Id.* at 21.

Three hearings occurred for the motion to modify custody at issue – on January 4, April 23, and July 1, 2019. *Id.* at 1. The 2013 custody order had been entered after four hearings – on October 2, 2012, and June 6 and August 8 and 30, 2013. *Id.*

On July 1, 2019, the trial court denied Mother's motion to modify custody and re-entered the 2013 custody order, giving Father primary physical custody of Child during the school year and granting Father and Mother shared legal custody, except for educational decisions, which were to be determined by Father alone. The trial court also ordered Mother to have

partial physical custody of Child every other weekend from Friday at 4:30 p.m. to Sunday at 4:30 p.m. and on Wednesdays from 4:30 p.m. to 7:30 p.m. during the weeks that she does not have weekend custody. At the end of the school year, the physical custody arrangements are reversed.

Mother *pro se* filed a timely notice of appeal with the following concise statement of errors complained of on appeal attached:

1.) The Judge failed to apply the most recent facts/evidence to the case including the recommendation of the court appointed, private, custody evaluator. The Judge ordered the updated evaluation and then chose to ignore facts and evidence supplied during the evalu[a]tion.

2.) The Judge also ignored evidence presented by the weekly therapist of the couple's teenage daughter.

3.) The Judge ignored the well-reasoned preference of the couple's teenage daughter.

4.) The judge "picked and chose" opinions- not facts- from two, previous, obsolete, custody evaluations to support his decision instead of relying on the most recent evidence in the case.

5.) The Judge allowed coun[se]l for father to introduce at trial a report disputing the court appointed custody evaluator's recommendation even though council for mother had never received a copy of the report prior to it being introduced as required by law. Abuse of discretion. [sic]

6.) The Judge failed to apply the rule of law in allowing [M]other adequate time to provide an answer to a motion and to retain council before requiring her to appear in court before Judge McMaster[]. Mother objected by faxing a letter to Judge McMaster's office, but he denied the request. (Judge McMaster[] heard Judge Rubenstein's cases during his medical leave.) Mother's answer to withdrawing suppor[t] for daughter's therapist would mean there was no evidence to support the verdict.

7.) The Judge based his decision on information from ten years ago that would have been explained by a witness originally subpoenaed to testify, but was out on medical leave. Information from the witness' treatment notes should be permitted for review if the Judge continues to base his opinion on one-sided information. (Notes of subpoenaed witness, Dr. Shaffer from CHOP, should be allowed to be added to Appeal Brief.)

8.) The Judge also altered the facts in order to justify his decision.

As Mother was represented by counsel at the time she filed her *pro se* notice of appeal and concise statement of errors, this Court ordered counsel to file an amended statement of errors by September 6, 2019. Counsel complied, even though he had previously submitted a formal praecipe to withdraw as counsel with the trial court, by filing the following amended concise statement:[1]

1. The Honorable Court abused its discretion and erred as a matter of law and fact in denying Mother's Petition to Modify Custody Order as stated in [its] July 1, 2019 and August 26, 2019 Orders and in not awarding Mother any additional custody time and/or primary physical custody of [Child].

2. The Honorable Court abused its discretion and erred as a matter of law and fact in disregarding the clear and concise written recommendations and testimony of the very Custody Evaluator the Court recommended, and the parties agreed upon, and who recommended a change in [Child]'s primary physical custody in favor of the Mother.

3. The Honorable Court abused its discretion and erred as a matter of law and fact in disregarding the well reasoned

_____

[1] This filing was counsel's last act on Mother's behalf, and Mother has represented herself throughout this appeal.

preference of 14 year old [Child] who was required to testify in open court before her Mother and Father.

4. The Honorable Court abused its discretion and erred as a matter of law and fact in failing to make any modifications to the August 30, 2013 Custody Order which was approximately 6 years old and pertained to a child who was 6 years younger.

5. Mother incorporates the 1925(b) statement previously filed by her on July 31, 2019 a copy of which is marked as Exhibit "A" attached hereto and made part hereof.

The trial court entered its opinion on September 27, 2019.

On March 4, 2020, Mother filed an application for post-submission communication with this Court, in which she "respectfully requests" to submit an additional exhibit "under Rule 210 Pa. Code 2501." On March 6, 2020, Father filed a motion to strike Mother's application.

In her appellate brief, Mother now presents the following issues for our review:

I. Did the trial court abuse its discretion by denying [Mother's] request for custody modification when evidence in the record demanded it? Was the trial court's decision unreasonable and clearly the result of bias, prejudice, or ill will?

II. [Did the trial court err as a matter of law by relying on the 2010 Evaluation and 2012 Evaluation to arrive at its 2019 conclusions?[2]]

---

[2] The second question listed in the "Statement of Issues Involved" in Mother's appellate brief is identical to the third question: "Did the trial court abuse its di[s]cretion by ignoring repeated examples of [F]ather ignoring the health and best interests of [Child]?" Mother's Brief at 5. We believe that this repetition is a mere typographical error, and have adjusted Mother's second question to reflect the second issue raised in the "Argument" section of Mother's appellate brief, *see id.* at 19-23; although we could have found this claim waived for Mother's failure to include it in her "Statement of
*(Footnote Continued Next Page)*

III. Did the trial court abuse its di[s]cretion by ignoring repeated examples of [F]ather ignoring the health and best interests of [Child]?

[IV.] Did the trial court abuse its discretion by ignoring the pleas of the 14-year-old child, whose relationship with her father is undeniably volatile, and who requested to return to the custody of her mother?

[V.] Did the trial court err by not acting in the best interest of the child in failing to conduct a thorough analysis of the 5328 factors[3] that determine a child's best interest?

_(Footnote Continued)_ ─────────────────

Issues Involved," Pa.R.A.P. 2116(a), we have chosen in this instance to apply our procedural rules liberally and to consider the second issue raised in her "Argument" section on the merits. ***See Womer v. Hilliker***, 908 A.2d 269, 276 (Pa. 2006) ("procedural rules are not ends in themselves, and that the rigid application of our rules does not always serve the interests of fairness and justice").

[3] In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

_(Footnote Continued Next Page)_

> [VI.] Did the trial court err by accusing Mother of making allegations of sexual abuse against paternal grandmother in

*(Footnote Continued)* _____

> > (4) The need for stability and continuity in the child's education, family life and community life.
> >
> > (5) The availability of extended family.
> >
> > (6) The child's sibling relationships.
> >
> > (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
> >
> > (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.
> >
> > (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.
> >
> > (10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.
> >
> > (11) The proximity of the residences of the parties.
> >
> > (12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.
> >
> > (13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.
> >
> > (14) The history of drug or alcohol abuse of a party or member of a party's household.
> >
> > (15) The mental and physical condition of a party or member of a party's household.
> >
> > (16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

2010? Did the trial court ignore evidence in the record that shows Mother did not make the allegations, and, therefore, refuse to modify custody?

Mother's Brief at 5 (issues re-ordered to facilitate disposition) (unnecessary capitalization omitted).

"In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion." *D.K. v. S.P.K.*, 102 A.3d 467, 478 (Pa. Super. 2014) (quoting *J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa. Super. 2011)).

An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Nobles v. Staples, Inc.*, 150 A.3d 110, 113 (Pa. Super. 2016) (citations and internal quotation marks omitted). Additionally, when reviewing a custody order:

We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*D.K.*, 102 A.3d at 478 (quoting *J.R.M.*, 33 A.3d at 650).

Preliminarily, we note that throughout her brief, Mother wishes this Court to ignore its scope and standard of review. Mother repeatedly asks this Court to disregard the credibility and factual findings of the trial court and to make independent factual determinations, which we cannot and will not do. *Id.* For example, just within the first five pages of her appellate brief's "Argument" section, Mother requests that this Court reassess the trial court's factual findings about Mother's career, reassess the trial court's determination of Father's credibility, consider a member of Father's household to be Child's "babysitter/driver" and not a "housekeeper" as the trial court designated her, give less credit than the trial court did to Father's decision to provide Child with a math tutor, and recalculate the amount of vacation time that Father has per annum. Mother's Brief at 15-19.

Mother contends that "the most significant abuse of the trial court's discretion" was its reliance on the 2010 Evaluation and 2013 Evaluation "to arrive at [its] 2019 conclusions." Mother's Brief at 19. Mother continues:

> The trial court is required to take into account the undis[p]uted changes effecting the child and the parties in this case between the trial court's August, 2013 order and the July, 2019 order. The court[']s failure to do so is clearly not in the best interests of the child and represents an abuse of discretion.

*Id.* (citing *J.R.M.*, 33 A.3d at 652). In fact, Mother refers to this act as "the most significant abuse of the trial court's discretion[.]" *Id.*

However, Mother misrepresents the record. The trial court did consider the 2018 Evaluation in rendering its decision and concluded that the

findings of the 2018 Evaluation were consistent with the 2010 Evaluation and the 2013 Evaluation:

> Th[e trial c]ourt's decision to not follow the recommendations of Dr. [Gerald] Cooke was squarely based upon the facts in evidence. **Based upon the reports from all three (3) evaluations**, and the testimony of the witnesses, it was shown that Mother continues to make unilateral decisions concerning [Child]. For example, Mother terminated the child's psychotherapist at one point, and after [the 2018 E]valuation, she attempted to enroll the child in Germantown Academy in the middle of her 8th Grade year, all without Father's knowledge or consent.

TCO, dated September 27, 2019, at 36 (emphasis added). In addition, the trial court stated that it found Dr. Gerald Cooke's evidence to be credible. *Id.* at 41. The trial court further noted that, although Dr. Gerald Cooke's 2018 Evaluation had ultimately recommended that Mother have primary physical custody of Child, both the 2018 Evaluation and the report of Father's expert, Dr. Cohen, were "consistent" in their conclusion that Mother "suffered from a serious mental illness, 'Ring of Fire' [Attention Deficit Hyperactivity Disorder ('ADHD')]." *Id.*[4] Accordingly, Mother's contention

---

[4] The 2018 Evaluation was not the first time that Mother was diagnosed with ADHD. Mother had been diagnosed with what was then called Attention Deficit Disorder ("ADD") as far back as the 2010 Evaluation. TCO, dated September 27, 2019, at 3, 6 (citing N.T., 12/16/2010, at 40; 2010 Evaluation at 36). At that time, her own treating psychiatrist described her ADD as "severe[.]" *Id.* (citing 2010 Evaluation at 36). The 2013 Evaluation had likewise noted Mother's ADD diagnosis, adding that Mother also "suffers from a 'personality disorder[.]'" *Id.* at 14 (citing 2013 Evaluation at 28).

that the trial court did not consider any evidence subsequent to the 2013 Evaluation is belied by the record.

Next, Mother argues that "the trial court abused its discretion by ignoring repeated examples of the Father ignoring the health and best interests of [Child]." Mother's Brief at 24. Mother did not include this claim in either her initial statement of errors or her amended statement of errors, and, consequently, it is waived. Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived").

To the extent that this issue is encompassed within Mother's overarching contention that the trial court abused its discretion by denying Mother's petition to modify custody, we would still find it meritless. Mother's assertion that Father has ignored Child's health is based upon two alleged incidents.

In the first example, Child "hurt her wrist skiing on a school ski trip on a Thursday[,]" but Mother claims that Father "ignored" Child's pain. Mother's Brief at 24. Mother continues that "[e]vidence existed that [F]ather had no appointments set up when [M]other took [Child]" to an urgent care center and then "to the orthopedist as per Urgent Care doctor's orders." *Id.* at 24-25.

Nevertheless, Mother provides no date for this incident, besides "a Thursday"; ergo, we cannot determine whether it occurred subsequent to

the 2013 custody order or if the trial court had knowledge of and considered this event when it entered the 2013 order.[5] Furthermore, Mother's brief cites to pages in her reproduced record[6] showing text messages between Mother and Child. *Id.* at 24 (citing RR 143a, 344a-345a).[7] In Child's text, she stated that she was taking a Motrin, RR 143a, thereby calling into question Mother's argument that Father "ignored" Child's pain. Mother's Brief at 24. Moreover, the only evidence that Mother provides of this supposed sequence of events are the aforementioned pages of text messages between herself and Child, consisting of a total of seven messages, and copies of e-mails that Mother herself wrote to Dr. Gerald Cooke during the 2018 Evaluation telling him about this event. *Id.* at 24 (citing RR 143a, 344a-345a, 354a-355a). Mother's allegation that this

---

[5] One of the print-outs of text messages between Mother and Child, discussed hereinafter, have "Feb 2018" handwritten on it. RR 344a. However, there is no evidence of who wrote the date or if this date is when the messages were sent or when they were printed.

[6]     A "reproduced record" is a "portion of the record that has been reproduced for use in the appellate court." Pa.R.A.P. 102. It is prepared by the appellant and contains copies of the parts of the certified record that the parties elect to provide to the appellate court to assist it in deciding the case. Pa.R.A.P. 2154(a); *see also* Pa.R.A.P. 2151, 2171.

*Erie Insurance Exchange v. Moore*, 175 A.3d 999, 1006 n.4 (Pa. Super. 2017), *appeal granted on other grounds*, 189 A.3d 382 (Pa. 2018).

[7] Mother's brief additionally cites to RR 346a-347a, which also contains two text messages—one from Child to Mother and vice versa; however, there is no mention of Child's wrist or any injury in them.

incident even occurred is therefore based upon a paucity of evidence, and we cannot find that the trial court abused its discretion by not relying upon this alleged occurrence in rendering its custody decision. *See D.K.*, 102 A.3d at 478.

Mother's second example of Father "ignoring" Child's health was when Father "disregarded doctor's orders when [Child] was seen for a viral syndrome with fever." Mother's Brief at 25. Although Mother cites to a letter from "myinstadoc urgent care" that Child "is unable to return to school until fever free 24 hr[,]" *id.* at 25 (citing RR 341a), Mother presents no evidence that Father, in fact, "disregarded" this order, besides her bald claim.[8] Again, we cannot find an abuse of discretion by the trial court without sufficient evidence of record. *See D.K.*, 102 A.3d at 478.

Next, Mother contends that the trial court "abused its discretion by ignoring the pleas of the 14-year-old child, whose relationship with her father is undeniably volatile, and who requested to return to the custody of her mother[,]" despite the trial court also describing Child as "[a]rticulate,

_____

[8] Mother's brief also states: "All of this evidence was readily available in the record, but the trial court simply ignored it. (RR 78a)" Mother's Brief at 25. However, RR 78a is a print-out of "Page 5 of 6" (without pages 1-4 or 6) of a report by Pamela Harrington, M.D., that states nothing about Child having a virus. Instead, the information on RR 78a was mainly about Child's behavioral health and was mostly positive, finding that Child was "[n]ot actively suicidal" nor "emotionally or mentally abused[,]" albeit that Child had "discomfort with [Father.]"

bright, [and] responsive" and noting that Child "made her position as clear as could possibly be." Mother's Brief at 37 (quoting N.T., 7/1/2019, at 7).

> The preference of a child in a custody case, although not controlling, is a factor to be carefully considered, **as long as it is based on good reasons**. The child's maturity and intelligence must be considered, and the weight to be given the child's preference can best be determined by the judge before whom the child appears.

*Swope v. Swope*, 689 A.2d 264, 266 (Pa. Super. 1997) (emphasis added) (citations omitted); *see also Altus-Baumhor v. Baumhor*, 595 A.2d 1147, 1150 (Pa. Super. 1991) ("[i]nsofar as the court's failure to be guided by the child's preferences is concerned . . . such preferences are **not** controlling" (emphasis added)).

After the hearing, the trial court observed that Child's preference for living primarily with Mother was **not** "based on good reasons." *Swope*, 689 A.2d at 266. As the trial court comprehensively explained:

> [C]hild has a preference to live primarily with Mother however, th[e trial c]ourt did not find that her preference was well-reasoned. [The trial court] stated [at the conclusion of the 2019 custody modification hearing]:
>
>> Does [Child] have a preference? Absolutely. Is it well-reasoned? Yes, if you're 14, it's well-reasoned, but [the trial court] do[es]n't believe it's indicative of the maturity and judgment which Mother's counsel would have [it] believe. [Child's preference is] not the end-all and be-all.
>
> [N.T., 7/1/2019, at 34.] . . .
>
> Th[e trial c]ourt recounted [C]hild's testimony regarding her preference to leave the primary custody of Father.
>
>> [The trial court took] notice of the fact that New Hope-Solebury[, Child's then-current school district,] is perhaps

considered on[e] of the finest public-school systems in this Commonwealth.

[Child] was as blunt as she could possibly be, and [the trial court] wrote down a quote from [Child]. She says, ["]I'm not doing well in school, especially in math.["] She said her current math grade was a 60. Her other grades were, quote, not so good, end of quote. She seemed to be a child who was, at least, failing academically. . . .

[Child] was not enthusiastic about [her weekly therapist]. She said that while she may be qualified, she had only offered [Child] some coping mechanisms. And she looked right at me, and she said, ["]I don't want to cope. I want out.["]

She admitted that she personally had called Children & Youth and the police. . . .

She was asked about her . . . feelings, and she said that she feels great sadness being with her Dad, and to confirm that, she said she does not want to be there.

*Id.* at [8-9].

However, [the trial court] also noted that [Child] has an agenda and that her reasons for wanting to live primarily with Mother were not based upon anything other than the wishes of an overly indulged 13-year-old.[9] Th[e trial c]ourt stated as follows:

So I have, at first blush, a child who is miserable, who believes her father either doesn't listen or won't listen to her and has no concern with her feelings, present or past, or future; who is failing in school and is crying out for help, to the point where she calls the police and says she doesn't feel safe. When I hear that I'm somewhat taken aback.

What about projects in school? She says Mother helps. Father does not help me at all, which is possible. I believe the evidence we heard generally is contrary to that proposition.

_____

9 Child was still 13-years-old when she testified before the trial court.

How about cooking? Mom cooks for me, says [Child]. Father doesn't even provide breakfast or lunch. She was asked about her preference, and she said well, even though she is fearful of Father and she believes he is, quote, "scary", she nonetheless will agree to see him only on the weekends.

Then she told me about her matriculation to Germantown Academy. While she was happy with that choice, she said that Father, who may pay the bills for that education, doesn't really care about her feelings. She has described him as insensitive. [The trial court] noted that, at least viewing her demeanor and her responses, that she was a very compelling witness. She was articulate and bright, and it was abundantly apparent.

Is that really what occurred here? Well, yes. If you believe [Child], then the result is clear. She should be living with her mother primarily. The problem with that, in general, is we don't decide custody cases based upon the request or preference of a 13-year-old child. . . .

If I were a 14 year old and the choice were left to me, I'd probably want to live with (Mother). Why is that? She's less stringent than Father. She has less rules. She sounds like a fun mom. They went on vacation to the Grenadines. I'd probably want to live with (Mother).

Why wouldn't I want to live with Father? Well, he yells and screams and makes me do my homework. He grounds me, no exceptions. That's the response of an albeit bright, but nonetheless 14-year-old child. Then I was somewhat quizzical about how this child can, who is failing so badly in such an excellent school system, even consider going to Germantown Academy. Somehow that was accomplished.[10] . . .

[Child] volunteered that she was a minimalist, whatever that means. She described it as I don't have any decorations in my room. This minimalist had a $600

_____

[10] During oral argument before this Court, both parties agreed that Child's grades have improved since she transferred to Germantown Academy.

haircut in New York. She gets to pick and choose. No pictures, but take a little off the top.

*Id.* at [10-14.]

Th[e trial c]ourt questioned how genuine [C]hild's alleged problems in school were and whether there was an ulterior motive to her claims of failing grades.

Then as [Child] was testifying, [the trial court thought, "T]his is, by all accounts, a very bright, responsive, articulate little girl. Is she failing in school purposely so that [the court will] believe that Father is not attending to her academics? Is that something that she conjured up? Again, it's within the equation. . . .

She is academically sound enough to be accepted to Germantown Academy, but her grades are not 60's and failing - - She is, if not thriving, doing well enough. So, her testimony, at least, on that score doesn't have the ring of truth. I think she engaged in hyperbole when the facts are otherwise. . . .

[Child], in [the trial court's] view, has an agenda. [The trial court does not] think it's diabolical. She's a 14-year-old girl. She wants to live with her Mother, and as [the court] said, if I were that age, I'd want to live with Mother. It's a lot easier.

So when [Child] speaks here in court, and when she talks to Dr. (Gerald) Cooke, she will exaggerate all of Mother's pluses, of which there are many, and she will exaggerate all of Father's minuses, and [the trial court is] sure there are plenty, as well, as there are with Mother.

*Id.* at [15-16, 26.]

TCO, dated September 27, 2019, at 32, 38-41 (some formatting).

The record supports the trial court's findings, and we see no abuse of discretion that would warrant reversal on this ground. *See Swope*, 689 A.2d at 266; *see also Ellingsen v. Magsamen*, 486 A.2d 456 (Pa. Super. 1984) (children's stated preference to remain with their father because of a

large yard, a pony, more friends, and less noise "lacked a sufficient basis to be accorded controlling weight"). We are satisfied that Child's preference, despite being overruled, was nevertheless considered by the trial court. **See Swope**, 689 A.2d at 266; **Altus-Baumhor**, 595 A.2d at 1150.[11]

Mother next contends that "the trial court erred by not acting in the best interest of the child in failing to conduct a thorough analysis of the 5328 factors that determine a child's best interest." Mother's Brief at 28 (citing **M.E.V. v. F.P.W.**, 100 A.3d 670 (Pa. Super. 2014)). However, Mother did not include this claim in either her *pro se* or counseled concise statement, and, consequently, it is waived. Pa.R.A.P. 1925(b)(4)(vii).

Assuming this claim were not waived, it is belied by the record. The trial court addressed the custody factors enumerated in 23 Pa.C.S. § 5328(a) at the close of the July 2019 custody hearing and in its opinion.

For the first custody factor, "[w]hich party is more likely to encourage and permit frequent and continuing contact between the child and another party[,]" *id.* § 5328(a)(1), the trial court stated that "both [parents] were

---

[11] Nonetheless, we note that Child is nearing the age of the "Elephant Rule." **See E.B. v. D.B.**, 209 A.3d 451, 468 (Pa. Super. 2019) ("It has been said that an older teenage child is like an elephant – she sleeps wherever she wants. While the 'Elephant Rule' is not incontrovertible, such as if a teenager's safety were at risk, or if the other factors strongly demonstrated that a teenager's preference was against her best interest, courts have to recognize the limitations of their power in determining where older teenagers must reside.").

capable of permitting frequent and continuing contact, Father more so than Mother." TCO, dated September 27, 2019, at 32; *see also* N.T., 7/1/2019, at 33. For the second custody factor, "[t]he present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child[,]" 23 Pa.C.S. § 5328(a)(2), the trial court asserted that "there was no abuse found[.]" TCO, dated September 27, 2019, at 32; *see also* N.T., 7/1/2019, at 34. For the third custody factor, "[t]he parental duties performed by each party on behalf of the child[,]" 23 Pa.C.S. § 5328(a)(3), the trial court noted that "both parents are capable of performing their parental duties." TCO, dated September 27, 2019, at 32; *see also* N.T., 7/1/2019, at 34. For the fourth custody factor, "[t]he need for stability and continuity in the child's education, family life and community life[,]" 23 Pa.C.S. § 5328(a)(4), the trial court observed that while, generally, "[t]here is stability and continuity in [C]hild's life[,]" it expressed concern about Mother's ability to provide stability and continuity in Child's education. TCO, dated September 27, 2019, at 32; *see also* N.T., 7/1/2019, at 34. For the fifth custody factor, "[t]he availability of extended family[,]" 23 Pa.C.S. § 5328(a)(5), the trial court considered that "both parents have strong support systems." TCO, dated September 27, 2019, at 32; *see also* N.T., 7/1/2019, at 34. The sixth custody factor, concerning sibling relationships, is inapplicable, as Child

has no siblings. 23 Pa.C.S. § 5328(a)(6); TCO, dated September 27, 2019, at 32.

The trial court provided extensive analysis for the seventh custody factor, "[t]he well-reasoned preference of the child, based on the child's maturity and judgment[,]" 23 Pa.C.S. § 5328(a)(7), as discussed above. TCO, dated September 27, 2019, at 32, 38-41; **see also** N.T., 7/1/2019, at 8-16, 26, 34.

For the eighth custody factor, "[t]he attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm[,]" 23 Pa.C.S. § 5328(a)(8), the trial court found: "Neither party has attempted to turn the child against the other parent. Mother may have in the past, but there is no recent evidence." TCO, dated September 27, 2019, at 32; **see also** N.T., 7/1/2019, at 35. For the ninth and tenth custody factors, "[w]hich party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs" and "[w]hich party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child[,]" respectively, 23 Pa.C.S. § 5328(a)(9)-(10), the trial court concluded that "[b]oth parties are able to maintain a loving, stable, consistent, and nurturing relationship with the child and they are able to address her physical and emotional development." TCO, dated September 27, 2019, at

32; *see also* N.T., 7/1/2019, at 35. For the eleventh and twelfth custody factors, "[t]he proximity of the residences of the parties" and "[e]ach party's availability to care for the child or ability to make appropriate child-care arrangements[,]" respectively, 23 Pa.C.S. § 5328(a)(11)-(12), the trial court stated: "The parents live in different counties, however . . . the distance between the parents is not impossible to overcome, and both are capable of making alternative childcare arrangements." TCO, dated September 27, 2019, at 32-33; *see also* N.T., 7/1/2019, at 35. For the thirteenth custody factor, "[t]he level of conflict between the parties and the willingness and ability of the parties to cooperate with one another[,]" 23 Pa.C.S. § 5328(a)(13), the trial court acknowledged that "[t]here is a high level of conflict" but did not find this factor in favor of either party. TCO, dated September 27, 2019, at 33; *see also* N.T., 7/1/2019, at 35-36. The trial court found the fourteenth custody factor, "[t]he history of drug or alcohol abuse of a party or member of a party's household[,]" 23 Pa.C.S. § 5328(a)(14), inapplicable, as "there is no evidence of alcohol or drug abuse." TCO, dated September 27, 2019, at 33; *see also* N.T., 7/1/2019, at 36.

The trial court discussed the fifteenth custody factor, "[t]he mental and physical condition of a party or member of a party's household[,]" 23 Pa.C.S. § 5328(a)(15), at length:

> The mental and physical conditions of the parties was the most important issue in this case. Th[e trial c]ourt was still concerned

about Mother's mental health issues and Mother's assertion that her prior ailments are cured. [The trial court] stated:

> Personality disorders do not appear and then disappear. I'm not saying that as a psychiatrist. I'm not a psychiatrist. It's just common sense. Again, what happened before; is it likely to happen again? I hope not, but it's more likely to happen with Mother than with Father.

[N.T., 7/1/2019,] at 27.

With regard to [Child]'s need for continuing psychotherapy we stated:

> Again, Mother's counsel is right. Don't dwell on the past. Look to the present. Okay. That's a little over a year ago, and [the trial court] mentioned this before. Mother makes a mistake. Not a horrible mistake, but a unilateral decision. She in no uncertain terms says to [Child's weekly therapist,] you are done; that is it. You are not treating [Child] anymore.
>
> What is the reason she did that? Because [Child's therapist] was ineffective? Because she wasn't qualified? No, she did it because she believed that the child's therapist was siding with the father.
>
> So, here's the options. You contact [Child's therapist] and say I think you're missing the boat with [Child]. She's told me the following; you're not reaching her, or you bite your lip and you call Father and say we have the impression that there's no real connection between [the weekly therapist] and [Child], and perhaps we ought to find a different therapist who will exercise a different modality.
>
> Instead, of all the options, she chooses the worst one, which is you're done.

*Id.* at 28-29.

TCO, dated September 27, 2019, at 33 (some formatting).

Finally, for the sixteenth "catch-all" custody factor, "[a]ny other relevant factor[,]" 23 Pa.C.S. § 5328(a)(16), the trial court expressed its

"concerns about Mother's ability to get the child to school on time." TCO, dated September 27, 2019, at 34. The trial court declared:

> Much was said about [Child]'s enrollment at Germantown Academy. It's something that involves travel time. . . . [The trial court] believe[s] to the core that Father will do as he says. He will get [Child] on that train no matter how she might protest on a given day, and he'll wait for her to get on that car, knowing full well that before 8 o'clock she'll be at Germantown Academy. Of that [the court is] sure.
>
> [The trial court] would hope that if the circumstances were different, Mother, who lives 35 miles away from Germantown Academy, would do the same, except [M]other has for many years complained about traffic and being tied up in traffic.

N.T., 7/1/2019, at 30; **see also** TCO, dated September 27, 2019, at 34.

Thus, Mother's contention that the trial court "fail[ed] to conduct a thorough analysis of the 5328 factors[,]" Mother's Brief at 28, is contradicted by the record. Moreover, Mother's brief fails to specify which of the custody factors were allegedly not considered by the trial court. **See id.** at 29-33.

Mother's final issue – that "the trial court erred by accusing Mother of making allegations of sexual abuse against paternal grandmother in 2010[,] despite evidence in the record that shows Mother did not make the allegations, the trial court refused to modify custody[,]" Mother's Brief at 33 – is also waived for Mother's failure to include it in either of her concise statements. Pa.R.A.P. 1925(b)(4)(vii). Assuming *arguendo* that this question were not waived, we would note that, in its analysis, the trial court only made one, brief reference to Mother possibly falsely accusing Child's paternal grandmother of sexual abuse and that it was merely used as one of

many examples of Mother's erratic behavior. **See** N.T., 7/1/2019, at 22-23; TCO, dated September 27, 2019, at 37-38.[12]

For the foregoing reasons, we find no abuse of discretion in the trial court's disposition of this matter. **See D.K.**, 102 A.3d at 478. We therefore affirm the trial court's denial of Mother's motion to modify custody.

Finally, we consider Mother's application for post-submission communication, which stated that it was submitted "under Rule 210 Pa. Code 2501." We believe that Mother refers to Pennsylvania Rule of Appellate Procedure 2501, which controls post-submission communications and states in relevant part:

> After the argument of a case has been concluded or the case has been submitted, no brief, memorandum or letter relating to the case shall be presented or submitted, either directly or indirectly, to the court or any judge thereof, except **upon application** or when expressly allowed at bar at the time of the argument.

Pa.R.A.P. 2501(a) (emphasis added). Accordingly, Mother's application for post-submission communication was permitted pursuant to this Rule, and we consequently grant the application. As Mother's application was appropriate under our Rules, we deny Father's motion to strike said application.

_____

[12] Mother had also previously falsely claimed that Child, who was four-years-old at the time, had been sexually abused by another student at her daycare. TCO, dated September 27, 2019, at 2, 4-5 (citing N.T., 12/16/2010, at 70; 2010 Evaluation at 27-30).

Nevertheless, we find that the submitted communication, which purports[13] to be a transcript of an argument between Child and Father, is duplicative of other evidence and does not alter our disposition.

Order affirmed. Mother's application for post-submission communication granted. Father's motion to strike denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/27/2020

---

[13] We say "purports," because Mother has provided no authentication of this conversation and fails to specify when or where it allegedly occurred. (Furthermore, if it is genuine but was recorded without Father's permission, that recording may be illegal.) Ultimately, its validity is irrelevant, because it has no bearing on our decision.